THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWARD ALICEA, Appellant.

First Department, December 30, 1974..

*Armende Lesser* for appellant.

*Robert M. Stone* of counsel (*Mario Merola, District Attorney*), for respondent.

STEUER, J. P. The able and painstaking dissent requires some explanation of how the majority could reach the conclusion to affirm. It has long been recognized that no trial is entirely free from error and it is only such error as precludes a proper determination that mandates a new trial (see CPL 470.05, subd. 1). We neither condone nor excuse the conduct of the Assistant District Attorney who conducted the prosecution and share the feeling of outrage that is implicit in the dissent. Notwithstanding this visceral reaction, we do not believe that the totality of incidents, including those not specifically set out in the defense, prevented the jury from making a determination on the evidence. While the issues were vigorously contested by the defense, the

essential elements were established beyond a reasonable doubt. The contention that the conceded homicide was committed in the course of self-defense is refuted by the circumstances of the killing. The proof was overwhelming that the shooting occurred while the deceased was in flight from the encounter between the four actors in the attempted robbery. Likewise, as to other contested details of the incidents leading up to the shooting, there was ample evidence to exclude any reasonable doubt. It is unfortunate and highly understandable that the prosecutor, either through ignorance or a false sense of values, overstepped the bounds of propriety to the extent of shocking the sensibilities of all concerned with the orderly processes of justice. But to reverse on this score would only provide a guilty defendant with an undeserved windfall.

The judgment of conviction should be affirmed.

CAPOZZOLI, J. (dissenting). This record presents difficult primary factual issues as to who fired the fatal shots which killed the deceased, Lopez, and what preceded the shooting. Vargus is appellant's cousin and was a codefendant at the trial. According to the prosecution, the slaying occurred when Alicea and Vargus sought to retaliate for the attempted robbery of Vargus by Lopez and Carlo Delgado. The latter testified for the prosecution at the trial to the effect that he and Lopez sought to "take off" Alicea because he had sold defective drugs to Lopez. According to him, in order to do this, they decided to rob his cousin, Vargus, whom they noticed standing with a box under his arm, which box bore a picture of a combination radio-tape player. The two approached Vargus and Delgado brandished a knife. Lopez attempted to grab the box, but Vargus was triumphant in the tug of war and ran away. Delgado, who did get his hands on Vargus, did not have an opportunity to use his knife. While fleeing Vargus allegedly turned and shouted "I'm going to get you" and continued running. Several minutes later Delgado observed Vargus returning with Alicea, who was carrying a paper bag. As they approached, Delgado claims that he saw the bag drop, revealing a black pistol in Alicea's hand. Delgado ran into a building, with Lopez running some distance to the rear. While ascending stairs in the building Delgado allegedly heard a shot, followed by an exclamation from Lopez: "Carlos, they hit me". When he looked back he saw Lopez lying face down on the lobby floor attempting to push himself up. Delgado testified that he continued his flight but stopped long enough to look out of a landing window from where he claims he saw Alicea standing on the sidewalk

in front of the building pointing a black revolver in the direction of the entrance way. While running through the building Delgado heard additional gun shots, totaling five in all. Lopez' body was eventually found on the fifth floor of the building. Several tenants in the building similarly testified that it was Alicea who possessed the gun.

On the other hand both Alicea and Vargus testified, consistent with their voluntary statements made to the police on the day after the slaying and with their Grand Jury testimony, to the effect that Vargus had done the shooting and both Alicea and Vargus were acting in self-defense. Alicea testified that he saw his cousin walking with a tape recorder in a box and saw Delgado, with knife in hand, Lopez and another attack Vargus. Delgado grabbed the box and ran, while Lopez grappled with Vargus, until Lopez allegedly reached for and then dropped a gun which had been in his waistband. The gun was recovered by Vargus, who then shot Lopez several times. Vargus also so testified and a number of witnesses corroborated their testimony as to who did the shooting and the circumstances leading to it. In other words, according to the defendants and their witnesses, Vargus was attacked by Delgado and Lopez, the former armed with a knife and the latter with a gun and, in the scuffle which ensued, Vargus shot Lopez with Lopez' own gun in self-defense.

The question presented by this record is whether, under the circumstances disclosed therein, defendant received a fair trial. The trial was unnecessarily extended because of the clashes between the court, the prosecutor and defense counsel. The resulting atmosphere was indicative of anything but a fair trial.

It must be emphasized that the evidence on both sides presented sharp issues of fact. In all fairness, the jury could have decided this case either way on the basis of the evidence adduced. However, the difficulty with this case is not so much the evidence but the manner in which this trial was conducted. It is difficult by this limited writing to reproduce the actual atmosphere in which this trial was held, as disclosed by the record. I have seldom reviewed a record which presented as many instances of clashes between the prosecutor and the court as does this one. It is unbelievable, unless one is willing to spend considerable time in going through over 2,100 pages of stenographic minutes taken at the trial. The continued failure of the prosecutor to abide by the court's instructions, his failure to frame questions to witnesses without assuming facts prejudicial to the defendant, despite repeated instructions to him by the court,

his conduct in allowing open contacts between himself and two of the jurors in open court, even to the extent of sharing cough drops from the jurors' box, and other instances of improper behavior, too numerous to mention, all leading to the conclusion that this defendant did not have a trial free of collateral issues which might well have had the effect of distracting the jurors from the real issue of guilt or innocence of this defendant.

While no attempt is being made to catalogue all the instances of questioned behavior of the prosecutor, a few instances will be set forth herein in order to convey the frustration of the court in its attempt to control the situation.

To better understand the picture, reference is made to a number of the statements made by the trial court in addressing the prosecutor concerning his conduct. Note the following:

" The Court: Just a minute. You made your speech Mr. ————— [prosecutor]." (p. 987).   *   *   *

" The Court: That's not what he said. You make halfcocked statements. You shouldn't make them anyhow." (p. 989).   *   *   *

" The Court: I have tried to guide you in that area for one week now, Mr. ——————— [prosecutor], and I'm just a little tired of it. You have not followed the Court's instructions in that regard, as in many others." (p. 1019).   *   *   *

" The Court: I don't want you to repeat that conduct.   *   *   *   you know that it is highly unethical and improper. That was not an error in judgment. It was not due to a lack of knowledge of the law. It was unethical." (p. 1029).   *   *   *

" The Court: I don't know what good it is going to do anyway. But again this must be the silver anniversary of my making this announcement. Mr. ——————— [prosecutor], I am talking specifically to you at the moment and also it applies to Mr. Muscio.   *   *   *   I don't know what else I can do to tey [sic] to get compliance from members of the bar who are officers of the court   *   *   *   and I am very tired and weary of giving these instructions and delaying the trial. (p. 1196).   *   *   *

" The Court: And there is to many repetitions of that. When I sustain an objection you attempt to elicit the same information by changing a word here and there.

Mr. ——————— [prosecutor]: Will your Honor allow me, most respectfully, to note an exception on the record.

The Court: An exception to my correction or exception to the ruling?

Mr. ——————— [prosecutor]: Not at all. Exception to the nature of the ruling that prohibits me and not from the correction.

The Court: Just stop this nonsense, Mr. ——————— [prosecutor]. When I rule I mean it ." (pp. 1270-1271).   *   *   *

" Mr. ——————— [prosecutor]: I most respectfully take an exception. I think I have been precluded from asking into a crucial area of exploration, sir.

Mr. Muscio: May I for the record object to this constant —— continuing statement as to what the Court is doing. It's prejudicial in that counsel is making it appear as though the Court is taking a position here and that's not the case at all." (pp. 1446-1447).

Accusing the court of prejudicing the People's case the prosecutor said:

"Mr. ———————— [prosecutor]: I'm going to object most respectfully. Your Honor's comment at the bench I think their [sic] prejudicial to the People's case and I most respectfully and humbly take objection to your Honor——

The Court: Now that you've done that, ask the next question.

Mr. ———————— [prosecutor]: Thank you, Judge.

Mr. Muscio: I have a defendant here whose rights may be prejudiced by reason of that statement because it indicates that that is a fact when Heaven knows the Court has exercised the patience of an Angel, not alone with counsel but with me as well." (p. 1481). * * *

"Mr. Muscio: Your Honor, will you now charge the jury, instruct the jury they're to disregard any question or any answer which alludes to the fact of a parole, particularly when counsel knows it was not the parole from a jail. He knows that very well. Your Honor has made certain rulings but he doesn't intent [sic] to abide by them, as you obviously can see, and I now move for the declaration of a mistrial and the withdrawal of a juror.

"Mr. Silverman: I join Mr. Muschio.

The Court: Motion for a mistrial is denied. * * * Now, Mr. ———————— [prosecutor], three times at the side bar I have indicated to you most strongly the bounds within which this line of inquiry may be pursued but again you seek not to follow the Court's instructions." (pp. 1507-1508). * * *

"The Court: Mr. ———————— [prosecutor]: in the absence of the jury, I want to call this to your attention. On at least three occasions during the course of this trial in the presence of the jury you have objected to the Court curtailing your examination of a witness or to prohibiting you from introducing some evidence. *That's a situation that could possibly lead the jury to believe that the Court was prejudiced against the People's case and or prejudiced on behalf of the defendant's case.*

I'm putting you on notice that if you do that again that I may act favorably on any motion for a mistrial that might be made.

If you object to the Court's ruling, you note your objection for the record. Period. Without any comment. (pp. 1550–1551; emphasis supplied.) * * *

"The Court: I don't know on what ground you would take an exception, Mr. ———————— [prosecutor], since you were the one who are guilty of violating the directions of the Court. I am the one who should take an exception and should do something about these continued, repeated failures on the part of a judicial officer, an officer of the court, a member of the bar, an assistant district attorney, violating the instructions of the Court time after time after time.

Despite your repeated violations you except to my calling them to your attention when you deliberately four times in a row ask the question that I sustained and excluded the first time. You repeated it three additional times. And that's the twenty-fifth time in the course of the trial at least that you have done that. Now, please——

The Court: A fine spectacle for the public and a jury to see a Judge acting in this fashion occasioned by the conduct of an assistant district attorney. I'm ashamed of myself to be put into this position." (pp. 1826-1828).

After all of the above and other instances which are not quoted in this writing, it is no wonder that the trial court was so com-

pletely frustrated and upset by what had been going on, as witness the following:

".The Court: What Mr. Muschio is presently complaining about is your habit, regular habit of incorporating a paragraph of testimony predicate to a question which I have condemned and forbidden numerous times already to the point *where I am abandoning my responsibility and not curtailing you further because my instructions carry no weight with you.* Every law school of the United States and there are fifty states in the United States, including the Supreme Court of the United States, all of these admonitions are routine, elementary, fundamental principles of law." (p. 1862 emphasis supplied).

As if what has hereinabove been discussed were not sufficient to lead one to the conclusion that this is far from the kind of a trial ordinarily expected in the courts of our State, there was another incident which complicated matters further. Counsel for the defendant complained to the court after summations and before the charge to the jury, that there had been a constant chatter and a constant exchange of candies or cough drops between number five and number six jurors and the District Attorney. After registering this complaint, appellant's counsel then addressed the court as follows:

"Now, this morning, as we came into — they came into the jury box the number 5 juror came in and looked directly at him, I'm referring to the district attorney, and went like this to him. (indicating) Indicating with my finger this sign.

Mr. Silverman: Three fingers up and the fore finger and thumb touching.

Mr. Muschio: Which everyone knows everything is okay. * * * But I hope he has enough integrity to realize that that kind of conduct cannot be condoned even though there is nothing wrong in it, and I suggest at this time that we remove that juror and substitute an alternate.

Mr. —————— [prosecutor]: * * * There has been cough drops laid on the table, if my recollection serves me — * * *

Yesterday I did, at the close of my summation, my throat was rather hoarse, and I did have occasion to take a coughdrop from that particular box, Your Honor. I have never during the course of the entire proceedings communicated with any juror whatsoever respecting anything.

What Mr. Muschio says I don't take quarrel with. * * * I have no control over any juror in the courtroom. * * * My entire communication with any juror in this case was an act, and that act was reaching out and taking a coughdrop from that box.

Mr. Muschio: And I suggest to Your Honor this man made you that sign this morning, yes or no?"

"Mr. —————— [prosecutor]: Mr. Muschio, I am not under cross examination here.

Mr. Muschio: You saw it. * * *

The Court: Did Juror 5 make that sign?

Mr. —————— [prosecutor]: He made some sign with his hand, whether it was that particular sign or not, I do not know. There was some movement of his hands at that particular time." (pp. 2060-2062).

One is made to wonder how could such an incident take place in a court room? Was that okay sign given by that juror to the prosecutor an expression of that juror's own feeling or did it also represent the feelings of other jurors? No one knows. What the effect of the action by the court in excusing jurors numbers five and six was upon the remaining jurors is unknown. Neither side asked the court for any further action after the two jurors were excused. In any event, the court did what the defense asked and the incident cannot be made the basis of a complaint at this stage, but it must be taken into account in evaluating the over-all fairness of this trial and also in judging the atmosphere surrounding the trial.

One might reasonably argue that none of the incidents referred to above, standing by itself, would be sufficient to infect the trial. But the real question is whether the totality of these incidents, added to others appearing in the record, can be said to be harmless and that they did not affect the rights of the defendant to a fair trial. I think not.

As was said in *People* v. *Garcia* (7 A D 2d 492, 495) : " There was not here an isolated or single error but a series of errors which when taken together lead irresistibly to the conclusion that the defendant was denied a fair trial. [Citing case.] "

The record is most unsatisfactory and indeed an unhappy one. I am not satisfied that this trial was conducted in the tradition of fair play and justice for which our courts are noted.

In *People* v. *Steinhardt* (9 N Y 2d 267, 269) a case also involving the behavior of a prosecutor, the court said:

" From beginning to end this was a most extraordinary trial, overlong and marked by many highly improper exchanges between prosecutor and defense counsel which the court could not or at least did not control. We have never seen a record in which so many clearly improper statements were made by a prosecutor. * * * Over and over again courts have reminded prosecutors that they are something more than mere advocates or partisans and that they represent the People and the People's justice in presenting proof." This language is particularly applicable to the record before us.

The People have devoted nine pages of their brief in endeavoring to explain away the conduct of the prosecutor and they argue that the incidents complained of, as they appear in the record, were not of such a magnitude, individually or collectively, as to require a new trial. In short, the position of the People is based primarily on the theory that, whatever improprieties there were, they are of a technical nature and should be over-

looked because they were harmless, quoting section 542 of the Code of Criminal Procedure, CPL 470.05 (subd. 1) and conclude that the resulting guilty verdict was not influenced by them. With all of this I disagree.

The recitation of the facts at the outset of this opinion sufficiently demonstrates that the trial was a hotly contested one, with close questions of fact. It cannot fairly be said that the guilt of the defendant was clearly demonstrated. In any event, the defendant was entitled to a fair trial, irrespective of whether or not his guilt was clearly proven.

In *People* v. *Savvides* (1 N Y 2d 554) the court had occasion to pass upon the effect of the improprieties of a prosecutor and it used language which is especially applicable to the case at bar.

" The conviction cannot stand. The administration of justice must not only be above reproach, *it must also be beyond the suspicion of reproach.* * * * Nor does it avail respondent to contend that defendant's guilt was clearly established or that disclosure would not have changed the verdict." (pp. 556–557; emphasis supplied). In *People* v. *Mleczko* (298 N. Y. 153, 162–163) the court said: " An appellate court is directed to disregard 'technical errors * * * which do not affect * * * substantial rights' (Code Crim. Pro., § 542). Manifestly, the Legislature could never have purposed that the court should regard errors as technical, no matter how grave or substantial they may be, upon the hypothesis that, in any event, the jury correctly decided the case. * * * Vicious though the crime was, convincing though the evidence of guilt may seem to be, we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt. We are not prepared to announce such a doctrine." Also, in *People* v. *Saccomanno* (25 A D 2d 528, 529) the court said: " Notwithstanding defendant's probable guilt, errors which produce a denial of a fair and impartial trial are grounds for reversal and are not to be deemed harmless. [Citing cases.] ".

I think it is only fair at this point to call attention to the fact that the Justice who presided at this trial is recognized as an outstanding jurist, of long experience in the trial of criminal cases and he simply could not get the prosecutor and, on fewer occasions, the defense counsel, to abide by his rulings and instructions. It is sad to read this record and to note the exas-

peration, frustration and disappointment of that court. The proceedings were less of a trial and more of a brawl.

Therefore, I dissent and vote to reverse the conviction and order a new trial because of the denial to the defendant of his constitutional right to a fair trial.

TILZER and MACKEN, JJ., concur with STEUER, J. P.; CAPOZZOLI, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County rendered on June 29, 1973, affirmed.